Kathleen Burdette Shields (Mass Bar No. 637438)
Email: ShieldsKa@sec.gov
33 Arch Street, 24th Floor
Boston, MA 02110
Phone: (617) 573-8900
Fax: (617) 573-4590
Attorney for Plaintiff
Securities and Exchange Commission

**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**Plaintiff,**<br>**v.**<br>**MICHAEL CHRISTENSEN,**<br>**Defendant.** | **Civil Action No. 26-CV-**<br><br>**COMPLAINT**<br><br>**Demand for Jury Trial** |

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendant Michael Christensen ("Christensen" or "Defendant"):

**SUMMARY**

1. This is an insider trading action. Defendant traded in the securities of PetIQ, Inc. ("PetIQ"), an Idaho-based pet products company whose stock was publicly traded, in advance of PetIQ's public announcement on August 7, 2024 that PetIQ would be acquired by a private equity firm (the "Announcement"). Defendant traded in PetIQ securities on the basis of material non-public information that PetIQ would likely be acquired.

2. Christensen's brother was a senior executive at PetIQ (the "Executive"). The Executive was an integral part of ongoing discussions about the acquisition with the potential acquiring firm, with members of PetIQ management, and with the PetIQ board of directors.

Before the Announcement, the Executive disclosed material, nonpublic information about the potential acquisition to Christensen. Christensen understood that the Executive had this confidential information because of his high-ranking position at PetIQ. Christensen then traded on that information by purchasing shares of PetIQ stock and options in July and August 2024.

3. On August 7, 2024, the day of the Announcement, the value of PetIQ's common stock rose 48% to close at $30.42 per share, up from the prior day's closing price of $20.57 per share.

4. By trading on the confidential and non-public information that he received from the Executive about the upcoming acquisition of PetIQ, Christensen breached his duty of confidence to his brother and he gained an unfair advantage over other investors in the public markets. As a result of his insider trading, Christensen reaped approximately $299,000 in illegal trading profits.

5. As a result of the conduct alleged herein, Christensen violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5].

6. The Commission seeks: (i) a permanent injunction against Defendant, enjoining him from engaging in the transactions, acts, practices, and courses of business of the type alleged in this Complaint, (ii) disgorgement of ill-gotten gains he received from the unlawful conduct set forth in this Complaint pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §78u(d)(5), (7)], together with prejudgment interest, (iii) civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1], and (iv) such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(e), and 27 of the Exchange Act [15 U.S.C §§78u(d)(1), 78u(e) and 78aa] and 28 U.S.C. §1331.

8. Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C §78aa]. Defendant Christensen resides in the District of Idaho, and PetIQ's corporate headquarters was in the District of Idaho. Also, certain of the acts, practices, transactions and courses of business constituting the violations alleged in this Complaint occurred within the District of Idaho, and were effected, directly, or indirectly, by making use of the means or instrumentalities of transportation or communication in interstate commerce, or the mails, including the internet and the telephone.

## DEFENDANT

9. Christensen, age 52, resides in Boise, Idaho and works in commercial real estate.

## RELATED ENTITY

10. PetIQ was a Delaware corporation with a principal place of business in Eagle, Idaho before its acquisition by a private equity firm named Bansk Group LP ("Bansk Group"). During the relevant period, PetIQ's securities were registered pursuant to Section 12(b) of the Exchange Act and traded on the Nasdaq Global Select Market under the ticker symbol PETQ. Once the acquisition closed in October 2024, PetIQ's shares were no longer publicly traded. PetIQ's business involved pet medications, pet wellness services and pet-related products.

## FACTUAL ALLEGATIONS

### PetIQ's Potential Acquisition

11. On June 2, 2024, Bansk Group made a non-binding proposal to acquire all outstanding shares of PetIQ common stock for $25.50 per share, subject to certain due diligence.

This proposal was shared with the Executive and with PetIQ's board of directors, which rejected the initial proposal on June 11, 2024.

12. On June 18, 2024, Bansk Group sent to the Executive a revised proposal to acquire all outstanding shares of PetIQ common stock for $28.50 per share, subject to certain due diligence. The Executive and members of PetIQ's board reviewed this proposal on June 19, 2024, and decided to allow Bansk Group to conduct limited due diligence, under a confidentiality agreement, to determine if Bansk Group would be able to offer additional value to PetIQ's stockholders with a further revised non-binding proposal.

13. On June 25, 2024, PetIQ and Bansk Group extended their confidentiality agreement so that Bansk Group could conduct additional due diligence, and the Executive signed the extension on behalf of PetIQ.

14. Between June 25 and July 1, 2024, PetIQ approved Bansk Group's request to discuss the potential transaction with certain financing sources, and PetIQ management held several discussions with representatives of Bansk Group and representatives of PetIQ's financial advisor in connection with the merger. On July 2, PetIQ provided Bansk Group with access to a virtual data room containing due diligence materials.

15. On July 5, 2024, the Executive met in person with a Bansk Group representative in London who reiterated Bansk Group's ability and desire to move quickly on the proposed transaction, subject to due diligence. On July 8, 2024, the Executive spoke with Bansk Group representatives who indicated they could be in a position to announce a transaction by the time of PetIQ's earnings release scheduled for August 7, 2024.

16. On July 16, 2024, Bansk Group representatives contacted the Executive to convey that Bansk Group was prepared to increase its purchase price to acquire all of PetIQ's

outstanding shares but that its purchase price would likely be limited to no more than $30 per share. The Executive responded that $30 was not a price at which PetIQ's Board would be willing to transact, and it appeared that the deal might not happen.

17. Discussions continued and, on July 17, 2024, Bansk Group submitted a further revised non-binding proposal to acquire all outstanding shares of PetIQ common stock for $31 per share, and to complete confirmatory due diligence and negotiate definitive documents in the next 21 days. Bansk Group told the Executive that its proposal reflected its best and final offer to acquire PetIQ. Later on July 17, 2024, the PetIQ board, including the Executive, discussed Bansk Group's latest proposal and indicated support for negotiating definitive agreements on the basis of the proposal.

18. Following this discussion, PetIQ's legal counsel sent a draft acquisition agreement to Bansk Group's legal counsel. Between July 23 and August 5, 2024, PetIQ and Bansk Group, through their counsel and their management, negotiated the terms of the acquisition agreement. On July 31, 2024, PetIQ's board, including the Executive, discussed the progress of the negotiations, including the projected timeline that the merger agreement would be announced before the market opened on August 7, 2024.

19. On August 6, 2024, PetIQ's board approved the acquisition, and on August 7, 2024, before the stock market opened, PetIQ and Bansk Group executed the acquisition agreement and issued the Announcement in a joint press release in which the Executive was quoted as saying that the acquisition price of $31 per share was "a substantial premium for PetIQ stockholders."

20. The $31 per share price that Bansk Group offered to purchase PetIQ included a premium of approximately 51% over the closing price of PetIQ shares on August 6, 2024, the

last full trading day before the Announcement.

**The Executive Had a Duty to Keep PetIQ's Information Confidential and Not to Misuse It.**

21. The Executive was required to comply with PetIQ's Insider Trading Policy. According to that policy, a PetIQ officer or employee in possession of "'material, nonpublic information' relating to the Company . . . may not (a) purchase or sell securities of the Company . . ., (b) direct any other person to purchase or sell such securities or (c) disclose the information to anyone outside the Company." The policy defined "material, non-public information" as "information that is not available to the public at large that could affect the market price of a security and which a reasonable investor would regard as important in deciding whether to buy, sell or hold the security," and the policy listed as examples "news of a pending or proposed merger, acquisition, tender offer, divestiture or disposition of significant assets."

22. The Executive was also required to comply with the company's Code of Business Ethics and Conduct, which provided that:

> All non-public information about the Company should be considered confidential information. Employees who have access to confidential information about the Company or any other entity are not permitted to use or share that information for trading purposes or for any other purpose except to conduct Company business as described in the Company's Insider Trading Policy. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision based on this information is unethical and illegal.

The Code of Business Ethics specifically identified news about a potential acquisition of PetIQ as information on which an employee could not trade.

**The Executive Disclosed Non-Public Information to Defendant, Who Used it to Trade.**

23. The Executive disclosed material nonpublic information about PetIQ's potential acquisition to Christensen during a family vacation in Italy from late June to early July 2024 and on additional occasions during the time period leading up to the public announcement of the deal

on August 7. On multiple occasions, Christensen traded on the basis of this material nonpublic information shortly after communicating with the Executive, including by placing trade orders immediately upon returning from Italy.

24. Defendant Christensen and his brother, the Executive, had a close personal relationship and communicated regularly by phone and text messages. They discussed confidential matters with each other.

25. Defendant Christensen and the Executive vacationed together in Italy from June 22 through July 4, 2024. On July 4, 2025, Christensen departed Italy to return home to Boise, Idaho, and the Executive and other family members and friends traveled to London to continue their vacation.

26. The Executive was working on the deal with Bansk Group during this vacation with Christensen. As the Executive stated in a text message to his sister (who was not on the trip): "I had a huge deal start while I was on vacation and it looks like it's going to be a rough July for work." During the vacation, the Executive was actively involved in PetIQ management's internal discussions, in communications with PetIQ's board of directors about the ongoing negotiations, and in external meetings with Bansk Group and PetIQ's financial advisor. While in Italy with Christensen, the Executive also planned an in-person dinner meeting with a representative of Bansk Group for July 5 in London.

27. On July 5, 2024, the day after returning from Italy, Christensen unsuccessfully attempted to purchase out-of-the-money PetIQ call options. A call option is a security that gives its holder the right to purchase a referenced security at a fixed price (the "strike price") within a set period of time that ends on the expiration date. Out-of-the-money call options are those where the strike price is above the current market price of the referenced security. Out-of-the-

money call options are typically purchased by investors who expect the price of the referenced security to rise above the option's strike price before the expiration date.

28. On the morning of July 5, 2024, Christensen placed an order in his brokerage account to purchase 100 PetIQ call options at a strike price of $25 per share, set to expire on October 18, 2024. His order automatically expired at the end of the trading day without being filled. At the time, the market price of PetIQ stock was approximately $22.60 per share. Before this attempted purchase on July 5, 2024, Christensen had not traded in his brokerage account for the preceding seven months and the account contained about $58,000 in cash and no securities.

29. About one hour after placing this order, Christensen communicated with the Executive by phone. Several hours later, Christensen transferred $142,000 from his bank account into his brokerage account. That cash deposit was available for trading on July 8, 2024.

30. On July 8, 2024, starting at about 10:30 a.m. and continuing for about an hour, Christensen purchased 8,000 shares of PetIQ stock for a total cost of about $180,000. That morning, Christensen also placed two orders to purchase out-of-the-money PetIQ call options. The first order was cancelled shortly after it was placed, but the second order, by which Christensen purchased 200 PetIQ call options with a strike price of $25 per share and an expiration date of August 16, 2024 – just over a month away – was filled at a total cost to him of about $20,000. The next day, July 9, 2024, Christensen bought another 400 shares of PetIQ stock for a total cost of about $8,800. Together, Christensen's PetIQ purchases on July 8 and 9, 2024 consumed almost all of the cash in his brokerage account.

31. About a week later, on the evening of July 16, 2024, after the Executive had rejected the revised offer from Bansk Group to acquire PetIQ at no more than $30 per share, and there was a possibility the deal would be terminated, Christensen and the Executive spoke on the

phone for about four and a half minutes.

32. The following morning, July 17, 2024, Christensen sold all 8,400 shares of PetIQ stock that he then owned. He made a small profit of approximately $240 on this sale.

33. Over the next two weeks, Christensen and the Executive communicated regularly by phone and text message. The Executive was in Boise, where Christensen lived, between at least July 28 and August 8, 2024, while PetIQ and Bansk Group continued to negotiate the terms of the acquisition agreement.

34. On July 30, 2024, at a point in the acquisition negotiations when Bansk Group had confirmed that the deal was scheduled to be announced on August 7, 2026, Christensen and the Executive spoke on the phone for about six and a half minutes. That evening, Christensen and the Executive met for dinner with their spouses. The next day, July 31, 2024, Christensen bought 5,000 shares of PetIQ stock. He added to that position on August 1 and August 2, buying 6,000 shares and 6,555 shares, respectively on those days. In total over the three days, Christensen's purchases of PetIQ cost approximately $373,800.

35. On August 3, 2024, the Executive texted Christensen to cancel their plans to get together, saying, "I have to work all day." The Executive said that they would get together the next day, August 4, for lunch. The Executive and Christensen then made plans to have dinner together with other family members on August 7, 2024. The Executive and Christensen also spoke on the phone twice on August 4, 2024, once for about nine minutes, and the second time for about eight minutes.

36. In addition to sharing information about the impending acquisition of PetIQ with Christenson, the Executive contemporaneously shared non-public information about the pending acquisition with other family members, and text messages among the family members show his

and the family's knowledge about the ongoing negotiations and impending announcement before it became public. For example, on August 3, 2024, the Executive texted Christensen and other family members to cancel their plans, explaining, "I am going to have to work all day today and can't be a good host. I need to move our lunch/dinner/hangout until tomorrow. Can we plan on doing lunch here tomorrow to catch up. Sorry but I am in the battle rn [right now] and it all has to get done today."

37. On August 4, 2024, at about 6:59 pm, Christensen and his mother exchanged text messages that revealed their knowledge of the acquisition negotiations, with Christensen's mother writing to him, "We'll see what [the Executive] says by Wednesday [August 7]. He may be out celebrating." Christensen's mother also texted him on August 6, 2024, stating, "You heard from [the Executive]? I wouldn't plan on them until they commit tomorrow. Hopefully the deal closes."

38. On August 4, 2024, at about 7:17 pm, the Executive texted Christensen, "Watch for the headlines for Wednesday [August 7] morning." Then, on August 6, 2024, Christensen texted the Executive and asked, "Still fighting through your deal?" The Executive replied, "Sign at 6:30 tonight and yes fighting at the end. It will get done."

39. On the afternoon of August 4, 2024, after receiving the August 3, 2024 texts described in paragraphs 35 and 36 above, Christensen deposited an additional $50,000 into his brokerage account. Those funds became available for trading on August 6, 2024. Christensen purchased additional shares of PetIQ stock on August 5 and August 6, 2024, buying 3,000 and 1,900 shares, respectively on those days. His purchases on those two days cost about $99,300.

40. When Christensen purchased PetIQ stock and options between July 8, 2024 and August 6, 2024, he was aware of information about PetIQ's potential acquisition. Christensen

knew or recklessly disregarded that the information was both material and nonpublic when he placed the trades. Christensen also knew or recklessly disregarded that the Executive had breached a duty in sharing this information with him or that Christensen was himself breaching a duty of trust and confidence to his brother by using the information for personal gain.

41. The acquisition was announced before the stock market opened on August 7, 2024. Christensen celebrated the announcement with his family members. He texted the press release to his mother, who responded, "It happened! Yahoo." Christensen then sent a congratulatory text to the Executive's spouse (who was also a PetIQ executive) stating, "What a rodeo! Very proud of what you two accomplished Wow!" That day, Christensen sold his 200 PetIQ call options, for total proceeds of about $109,100 and also sold all 22,455 shares of PetIQ stock that he owned, for total proceeds of about $682,800. Overall, Christensen's profits on his PetIQ trades in July and August 2024 were approximately $299,000.

**CLAIM FOR RELIEF**

**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Defendant's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

42. Paragraphs 1 through 41 above are re-alleged and incorporated by reference as if fully set forth herein.

43. By reason of the conduct described above, Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, or courses of business which operated or

would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

44. By reason of the conduct described above, Defendant violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R §240.10b-5] thereunder.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A. Permanently restrain Defendant, his agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R §240.10b-5];

B. Order Defendant to disgorge, with prejudgment interest, all ill-gotten gains that were obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §78u(d)(5) and (7)];

C. Order Defendant to pay a civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1];

D. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E. Grant such other further relief as the Court may deem just and proper.

**JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.

Dated: September 21, 2026

Respectfully submitted,

/s/ Kathleen Burdette Shields
Kathleen Burdette Shields (Mass Bar No. 637438)*
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
Phone: (617) 573-8904
Fax:(617) 573-4590
ShieldsKa@sec.gov

* Appearing pursuant to Local Rule 83.4(c) as an attorney employed by and representing the SEC, a United States agency